Fuchsberg, J.
(dissenting). This murder case has been tried three times. In the first trial, the jury disagreed. The second, which resulted in convictions and sentences of death, was followed by unanimous reversal by this court (33 NY2d 90), essentially for the failure of the Trial Judge to excuse biased veniremen for cause on the voir dire. Because the third trial was marred by the exclusion of what I believe to be competent, relevant and potentially exculpatory evidence, I am constrained to vote for reversal and another trial.
Since the salient facts are adequately detailed in our prior opinion, they need only be briefly recounted here. On September 13, 1968, three inmates of the Auburn State Prison, Charles Culhane, Gerald McGivern and Robert Bowerman, were being taken by automobile to a courthouse in Westchester County in connection with a coram nobis proceeding brought on behalf of Culhane. Two Deputy Sheriffs, Joseph Singer and William Fitzgerald, occupied the front seat. The three manacled prisoners, joined to the vehicle by leather security belts, were in the rear. The party never reached Westchester, the trip ending en route in the death of Fitzgerald and Bowerman and near-mortal gunshot wounds for Culhane and McGivern.
The three survivors were the only eyewitnesses. Deputy Singer, the single one available to the People in effect was arrayed against the two surviving prisoners, each of whom testified in his own behalf at the trial.[1]
According to the story related by Singer, Bowerman and Culhane attacked the deputies from the rear, using their locked handcuffs to choke the two officers as McGivern seized Singer’s revolver and fired it at Fitzgerald. Singer went on to state that he then fired at the two defendants, though the medical evidence tended to refute his assertion that he was choked by the handcuffs and the ballistics evidence introduced similar doubts as to his version of the shooting.
Appellants described the events very differently. Their claim was that it was only Bowerman, who, after cutting his own security belt with a concealed razor blade and unsuccessfully trying to persuade his fellow prisoners to do the same, *761 struck at Fitzgerald and Singer and grabbed the latter’s gun. As they told it, Bowerman, while holding them at gunpoint, had then undone Culhane’s belt and forced Culhane in turn to undo McGivern’s belt, at which point Fitzgerald suddenly turned, gun in hand, precipitating an exchange of fatal shots between himself and Bowerman.
Thus, the trial’s central factual issue was clearly framed: Had Bowerman, whose penal dossier included a prior history of mental disturbance and futile but violent efforts to escape, set in motion the tragic events of September 13 on his own, with the appellants playing only an unwilling and unwitting part, as they contended, or, instead, had Culhane an Mc-Givern actively aided and abetted Bowerman, as Singer swore?
To back their claim that Bowerman had initiated the escapé episode and had carried it through to its grisly end on his own, the appellants, among other things, sought to introduce the official prison and medical records chronicling his past attempts to free himself of prison and police custody. These records would have established that Bowerman was "suffering from a psychosis” and had been frustrated in his plans to escape on at least three earlier occasions. During the 14 years immediately preceding the events which resulted in the two killings involved in this case, he pursued repeated methods of self-release, ranging all the way from suicidal slashing of his wrists to a try at winning his freedom by shooting his way past a detective whose firearm he had seized. As recently as 1964, a Corrections Department guidance counselor officially reported him "highly dangerous”. Earlier, he had spent four months in the Matteawan State Hospital for the criminally insane after the State prison authorities at Elmira had at various times observed that he was poorly adjusted, depressed, and emotionally unstable. Significantly, in every one of these documented events, with the possible exception of one at the Brooklyn House of Detention, where an entry indicated that "it was rumored he planned a spectacular jail break with the aid of a girl friend on the outside”, he was the lone participant.
The majority, in affirming, nevertheless finds no "abuse of discretion” in the exclusion of this documentary evidence by the trial court, both when offered directly or as grist for cross-examination. It is difficult to understand how these records, unimpeachable in their source and having been kept in the regular course of business (cf. People v Foster, 27 NY2d 47, 52; *762 Kelly v Wasserman, 5 NY2d 425, 429), could be claimed to have been collateral, since they bore directly on the main, and most critical question of whether the conceded culpability of Bowerman was shared or unshared with the defendants.[2]
Of course, the jury would not have been compelled to conclude that, because Bowerman had demonstrated a propensity for violent jailbreaking and an equally consistent penchant for practicing it without the aid of others, he did in fact follow those patterns in this instance. But, it can hardly be denied that it may very well have made a world of difference to the triers of fact in deciding whether the escape was the work of but one man, Bowerman. Had they been aware that Bowerman was the only one of the three prisoners with a known propensity for endeavoring to escape and that he had never demonstrated that propensity in alliance with other prisoners, instead of being left, as the jurors were here, with an impression that none of the three prisoners appeared to have had any greater inclination to escape than the others, it is conceivable that the defense would have been credited.
Thus, the proffered proof was not only reliable, it was also relevant and material, on the principle that it is a defense to a criminal accusation that a person other than the defendant committed the crime. For that purpose, "similar acts * * * can be used to exonerate an innocent accused, where the acts evidencing the plan are those of a third person not the defendant” (2 Wigmore, Evidence [3d ed], § 341, p 245 [emphasis in original]; cf. People v Fiore, 34 NY2d 81). Under the *763 theory of the defense, Bowerman must be considered a "third party”. As I have already indicated, the defendants’ version of the events was not that Bowerman had "instigated” the escape or acted "in conjunction” with them. To the contrary, they were "vehement” in their position that it had been "done by Bowerman alone”.
Consequently, the admission of Bowerman’s "similar acts” to help establish the defendants’ noncomplicity in the escape and the murder would have been in conformity with the proposition that the most acceptable "test of relevancy is whether a reasonable man might believe the probability of the truth of the consequential fact to be different if he knew of the preferred evidence” (1 Weinstein’s Evidence, par 401 [07], p 401-27; see, also, Thayer, A Preliminary Treatise on Evidence at Common Law, pp 264-265 [1898]; McCormick, Evidence [2d ed], § 185, p 437).
Furthermore, uncharged immoral or criminal acts are admissible if they are probative of a matter in issue (e.g., People v Jackson, 39 NY2d 64; People v Molineux, 168 NY 264). Although generally excluded when the prior conduct involved is that of an accused (see People v Fiore, 34 NY2d 81, supra), this is for reasons of policy rather than logic (People v Mayrant, 43 NY2d 236, 239; People v Zackowitz, 254 NY 192, 198). So, when excluded, it is rarely for lack of relevancy, but because of inherent prejudice to the accused (see People v Davis, 44 NY2d 269, 274). However, when, as here, the prior conduct of a third party is at issue (cf. People v Duffy, 44 AD2d 298, 306, n 3 [Shapiro, J.], affd 36 NY2d 258, cert den 423 US 861), absent countervailing considerations of prejudice, the relevancy and materiality of the evidence is to be judged on its own merits.
On that score, it has been well said that, "one who has demonstrated a consistent response under given circumstances is more likely to repeat that response when the circumstances arise again, [and therefore] evidence of habit has, since the days of the common-law reports, generally been admissible to prove conformity on specified occasions” (Halloran v Virginia Chems., 41 NY2d 386, 391, a civil case whose principles are applicable to criminal cases as well [CPL 60.10]; see, also, People v Miller, 39 NY2d 543). In the practical application of this experiential principle, there appear to be no valid grounds for distinguishing between a case where the dispute revolves about an issue as to whether a person acted alone or *764 in concert and a case in which the issue posed is whether the person acted at all.
Moreover, if there were a valid evidentiary rule of exclusion —and the majority points to none — the evidence would still have to be received on the even more fundamental ground that its exclusion violated the constitutional right of the appellants to present exculpatory evidence on the issue on which, in the end, their guilt or innocence turned (see, generally, Clinton, Right to Present a Defense: An Emergent Constitutional Guarantee in Criminal Trials, 9 Ind L Rev 713).
As Chambers v Mississippi (410 US 284), which overturned the exclusion of a third party’s confession as hearsay, makes clear, the constitutional right of a defendant "to present witnesses in his own defense” (p 302) is not to be yielded up to unduly restrictive evidentiary practice. It simply will not do to point to a technical rule of evidence or an incident of judicial discretion which violates that credo. This is not to say that criminal defendants are entitled to an open sesame in the reception of evidence. Rather, the right to present exculpatory material is to be measured by the "fundamental requirements of fairness” (United States v Booker, 480 F2d 1310, 1311; see, also, Davis v Alaska, 415 US 308). That was not done here.
Finally, in view of what I find to be the decisiveness of this issue, it is unnecessary to discuss other disturbing aspects which, singly or in combination, added to the denial of a fair trial. Included among these was the charge to the jury, which the two dissenting Justices at the Appellate Division cogently criticized (57 AD2d 418, 421).
Accordingly, my vote is for reversal and a new trial.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur; Judge Fuchsberg dissents and votes to reverse in a separate opinion.
Order affirmed in a memorandum.

. In this court’s earlier opinion we noted that the prosecutor’s evidence "presented substantial questions of credibility” (33 NY2d, at p 96, n 1).

. The trial record goes far beyond the majority’s suggestion that the excluded proof was offered solely to show Bowerman’s general bad character. The colloquy which followed the offer could have left no doubt in the Trial Judge’s mind but that it was also directed in particular to those portions of the public records relating to Bower-man’s solo escape ventures. As defense counsel put it, a primary purpose was to show that Bowerman "didn’t care about his life, this man, the records would reflect, was involved in escapes” and, for that reason, counsel "picked out those portions which we considered essential” because they went "to the very heart of the issue, who precipitated this break, who killed Fitzgerald, was it done by Bowerman alone or was it done by Bowerman in conjunction with our clients, which we vehemently dispute’’. The District Attorney did not misconceive this purpose. In objecting, he stated, "This simply goes to show propensity which is not admissible”. And the Trial Judge, in explaining his ruling, after merely remarking that the evidence would be "irrelevant” and "incompetent”, fell back to the unelaborated position that "it would be highly unfair to permit the evidence of this type and it would deprive the People of a fair trial”. Thus, the very issues raised on this appeal — that the records were relevant and competent and that their exclusion or reception would affect the fairness of the trial —were expressly passed upon at trial and so preserved for our review. (Emphasis supplied.)